**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | | |
|---|---|---|
| FARE TECHNOLOGIES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 6:22-cv-00317-ADA |
| v. | ) | |
| | ) | |
| UBER TECHNOLOGIES, INC. d/b/a UBER, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## UBER'S OPENING CLAIM CONSTRUCTION BRIEF

## TABLE OF CONTENTS

I.   INTRODUCTION ..................................................................................................1

II.  LEGAL PRINCIPLES OF PATENT CLAIM CONSTRUCTION ..........................................3

III. ARGUMENT .....................................................................................................4

   A.  "Taxi"............................................................................................................4

   B.  "Trip Meter"...................................................................................................7

   C.  "Starting Point" and "Destination Point"..............................................................9

      1.  Without Construction, Jury Confusion Is Likely .........................................9

      2.  The Plain Language of Claims 1, 7 and 12 Support Uber's Constructions ................10

      3.  The Specification Supports Uber's Construction .......................................11

      4.  Dr. Mundy's Declaration Supports Uber's Construction ............................12

   D.  "Waiting Time Encountered in Traffic" ...........................................................13

      1.  This Term Is Indefinite ...............................................................13

      2.  If this Term Is Construed, the Court Should Adopt Uber's Proposed Construction.........................................................................16

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs. v. Sandoz, Inc.*,
  544 F.3d 1341 (Fed. Cir. 2008)..................................................................................9

*AFG Indus., Inc. v. Cardinal IG Co.*,
  239 F.3d 1239 (Fed. Cir. 2001)..................................................................................8

*Eastman Kodak Co. v. Goodyear Tire & Rubber Co.*,
  114 F.3d 1547 (Fed. Cir. 1999)..................................................................................4

*Eidos Display, LLC v. AU Optronics Corp.*,
  779 F.3d 1360 (Fed. Cir. 2015)..................................................................................4

*Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*,
  815 F.3d 1314 (Fed. Cir. 2016)..................................................................................7

*Impulse Tech. Ltd. v. Microsoft Corp.*,
  665 F. App'x. 872 (Fed. Cir. 2016) ..........................................................................12

*Interval Licensing LLC v. AOL, Inc.*,
  766 F.3d 1364 (Fed. Cir. 2014)......................................................................4, 13, 14

*Light Transformation Techs. LLC v. Lighting Sci. Grp. Corp.*,
  No. 2:12-cv-826-MHS-RSP, 2014 WL 3402125 (E.D. Tex. July 11, 2014)...........13

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
  572 U.S. 898 (2014)...............................................................................................4, 13

*NobelBiz, Inc. v. Global Connect, L.L.C.*,
  701 Fed. App'x. 995 (Fed. Cir. 2017)........................................................................7

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
  521 F.3d 1351 (Fed. Cir. 2008)...........................................................................3, 15

*Phillips v. AWH Corp.*,
  415 F.3d 1303 (Fed. Cir. 2005)............................................................................3, 4

*Samsung Elecs. Co. v. Elm 3DS Innovations, LLC*,
  925 F.3d 1373 (Fed. Cir. 2019)..................................................................................3

*Seymour v. Osborne*,
  78 U.S. 516 (1871).....................................................................................................4

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
  574 U.S. 318 (2015)............................................................................................................3, 4

*Teva Pharms. USA, Inc. v. Sandoz, Inc.*,
  789 F.3d 1335 (Fed. Cir. 2015)...............................................................................................4

*United Servs. Auto. Ass'n v. MiTek Sys., Inc.*,
  No. SA-12-CA-282, slip op. (W.D. Tex. April 2, 2014) ..........................................................9

**Statutes**

35 U.S.C. § 112............................................................................................................................4, 13

Pursuant to the Court's Scheduling Order (Dkt. 27) as amended (Dkt. 28), Defendant Uber Technologies, Inc. d/b/a/ Uber ("Uber") serves this Opening Claim Construction Brief on Plaintiff Fare Technologies, LLC ("Fare").[1]  As set forth herein, Uber requests that the Court construe five terms from Claims 1, 7, and 12 of the sole patent-in-suit, U.S. Patent No. RE46,727 (the '727 Patent).  The '727 Patent expired on August 18, 2018.

## I.    INTRODUCTION

The '727 Patent, which was filed in 1998, is directed to an improved "taxi trip meter system."  With respect to the then existing prior art, the '727 Patent explains that "[a] taxi fare is typically determined by a taximeter based on trip distance and waiting time in traffic" and "[t]axi drivers are free to take whichever route they choose."  Ex. 1, '727 Patent, 1:24-26.  Taxi drivers, however, can abuse this freedom to take advantage of customers.  For example, "[r]iders who are unfamiliar with the area being traversed are sometimes cheated by unscrupulous taxi drivers who take a roundabout route to inflate the fare."  Id. at 1:26-29.  As another example, "taxi drivers [may] try to increase income by driving very fast to minimize travel time and thus increasing customer turnover, but at the expense of safety."  Id. at 1:29-31.

To address these potential abuses, the '727 Patent proposes solutions that include determining "a distance violation," "a speed violation," or "a fare violation."  Id. at Abstract.  To identify these violations, the '727 Patent proposes a taxi trip meter system that records the trip route between the starting point and destination point of a taxi ride.  Id. at 2:39-52.  When the taxi ride concludes, the taxi trip meter system determines whether a violation occurred.  Id. at

---

[1]  A week before the due date for this brief, Fare sought leave to amend its preliminary infringement contentions to add claims 30-32 and 37-41.  (Dkt. 30.)  That motion is untimely, improper and in violation of the Court's OGP.  Accordingly, this claim construction brief only addresses terms in the claims originally asserted by Fare.

Figs. 2-3.  For example, to determine whether a distance violation occurred, the system determines actual distance, estimates the shortest distance, determines a permissible margin over the shortest distance, then compares the actual distance to the permissible margin.  *Id*. at 2:52-3:8, Fig. 2.  Similarly, a fare violation is raised when the actual fare exceeds an estimated taxi fare by a permissible margin.  (*Id*. at Abstract.)

The '727 Patent is directed to a problem that is not faced by Uber and, thus, the '727 Patent is inapplicable to Uber.  Rideshares are not taxis.  Rideshare vehicles do not have a taximeter and are not hired on demand (*i.e.*, by hailing them on the street).  Instead, ridesharing operates on a contract basis, more akin to how limousines operated in 1998.  A rider contracts with either Uber or a limo company to be picked up and dropped off at predetermined locations for an agreed-upon price.  In fact, Uber's business started as a way for passengers to book limos and other black cars for transportation.  (Ex. 2.)  The expansion of Uber's business where riders can now book any type of vehicle, not just black cars, does not change that underlying business model.

Because the '727 Patent is directed to taxi technology, not rideshares or even limousines, Fare's infringement claims rely on distorted meanings for terms in the '727 Patent.  For example, the terms "taxi," "trip meter," and "waiting time" all had very specific meanings in the taxi industry in 1998 and are inapplicable to modern rideshare.  And while the terms "starting point" and "destination point" could be applicable to modern rideshare, their meanings are clear from their use in the asserted claims and are consistent with their plain and ordinary meaning in the taxi industry.  Accordingly, Uber requests that the Court construe the five proposed terms consistent with their plain and ordinary meanings in the taxi industry in 1998, which are consistent with their use in the '727 Patent.  These constructions are claim dispositive.

## II.    LEGAL PRINCIPLES OF PATENT CLAIM CONSTRUCTION

When the parties dispute the scope of a claim term, "the court, not the jury, must resolve that dispute." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008). The ultimate conclusion in claim construction is a question of law. *Teva Pharms. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 325 (2015). However, "subsidiary factfinding is sometimes necessary," such as when the court must understand the science behind technical terms. *Id.* at 326.

"Claim terms generally are construed in accordance with" their "ordinary and customary meaning." *Samsung Elecs. Co. v. Elm 3DS Innovations, LLC*, 925 F.3d 1373, 1377 (Fed. Cir. 2019) (quotation marks omitted). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005). Courts will "deviate from a claim term's ordinary meaning," however, "when a patentee sets out a definition and acts as its own lexicographer or when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Samsung, 925 F.3d* at 1377-78 (quotation marks omitted). "A determination that a claim term 'needs no construction' or has the 'plain and ordinary meaning' may be inadequate when a term has more than one 'ordinary' meaning or when reliance on a term's 'ordinary' meaning does not resolve the parties' dispute." *O2 Micro*, 521 F.3d at 1361.

In claim construction, the Court must look first to "intrinsic" evidence: the claim language, specification, and prosecution history. *Phillips* 415 F.3d at 1314-15. The specification "is the single best guide to the meaning of a disputed term." *Id.* at 1315. Courts may rely on extrinsic evidence, such as "expert and inventor testimony, dictionaries, and learned treatises."

*Id.* at 1317.  A patent may be "so interspersed with technical terms and terms of art that the testimony of scientific witnesses is indispensable to a correct understanding of its meaning." *Seymour v. Osborne*, 78 U.S. 516 (1871) (cited with approval in *Teva Pharms.*, 574 U.S. at 331-32).  An expert "may explain terms of art and the state of the art at any given time." *Teva Pharms. USA, Inc. v. Sandoz, Inc.,* 789 F.3d 1335, 1339 (Fed. Cir. 2015).  "[T]he testimony of one skilled in the art about the meaning of claims terms at the time of invention will almost always qualify as relevant evidence." *Eastman Kodak Co. v. Goodyear Tire & Rubber Co.*, 114 F.3d 1547, 1555 (Fed. Cir. 1999) (abrogated on other grounds in *Cybor Corp. v. FAS Techs., Inc.,* 138 F.3d 1448 (Fed.Cir.1998) (en banc)).

A patent claim is indefinite if it fails to provide reasonable certainty regarding the scope of the claimed invention to a person of skill in the art.  *Nautilus, Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 901 (2014).  "The claims, when read in light of the specification and the prosecution history, must provide objective boundaries for those of skill in the art." *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1371 (Fed. Cir. 2014).  If a claim does not satisfy the above requirements, then it is invalid under § 112.  *Nautilus*, 572 U.S. at 901.  "The indefiniteness inquiry ... is intertwined with claim construction ... ." *Eidos Display, LLC v. AU Optronics Corp.*, 779 F.3d 1360, 1364 (Fed. Cir. 2015).

## III.   ARGUMENT

### A.   "Taxi"

| Claim(s) | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| Claim 1 | Plain and ordinary meaning. | "an automobile licensed for hire as a taxi or taxicab and fitted with a meter" |

Claim 1 of the '727 Patent is directed towards "[a] taxi trip meter system for a *taxi*." This claim also requires "measuring an actual trip distance traveled by said *taxi* between a starting point and a destination point" and "providing geographical location information about said *taxi* to said computer." The '727 Patent does not define a taxi other than to say it is a vehicle. (Ex. 1, '727 Patent, 2:21-26.)

A taxi, however, cannot just be any vehicle that transports people in exchange for some compensation. Such a broad construction, as is inherent in Fare's infringement allegations, would sweep in limos, buses, and even carpools where gas money is paid. As explained, the problems identified by the '727 Patent, namely taking an inefficient route to increase a fare, are only applicable to taxis, and not limos or other vehicles. Thus, consistent with a POSITA's understanding, a taxi is defined by at least two requirements: (1) it is licensed for hire, and (2) it is fitted with a meter. (Ex. 3, Mundy Decl. at ¶ 27-33.)

*First*, a taxi is an automobile that is licensed for hire as a taxi or taxicab. (*Id*.) A "taxicab is the oldest form of licensed public transportation in the world, with the first licensing of taxis traceable to the Seventeenth century." (Ex. 4, Taxi!, at 7.) The term "taxi" comes from the German word for "tax." (Ex. 3, Mundy Decl. at ¶ 27.) A taxi is also referred to as a taxicab, which "is a contraction of the German word Taxe, meaning tax or charge, and the French term Cabriolet, originally the name for a style of horse carriage that would also be applied to automobiles." (Ex. 5, Is the Fare Fair, at 2.)

"Regulations, the legislation impacting on the supply of taxis, have emerged as a result of the history of the taxicab and are commonly applied to the numbers of vehicles licensed (quantity control), to vehicle and operator fitness standards (quality control) and to their fares (economic control), collectively as QQE." (Ex. 4, Taxi!, at 35; *see also* Ex. 3, Mundy Decl. at ¶

28.)  In the United States, "cities and local authority areas defined as licensing authorities" regulate taxis to "protect[] the public interest."  (Ex. 4, Taxi!, at 35)

Licensing authorities define what constitutes a taxi or taxicab.  (Ex. 3, Mundy Decl. at ¶ 28.)  The regulations for licensing taxis and taxicabs vary by regions.  (*Id*. at ¶ 32.)  In the United States, taxis are typically defined in a similar manner as Hillsborough County's regulatory definition: "any motor-driven vehicle, equipped with a taximeter with a capacity for 6 or less passengers, including the driver."  (*Id*.)

*Second*, a taxi is an automobile that is fitted with a meter.  (*Id*. at ¶ 27-33.)  For example, in 1992, the city of Austin, Texas described taxicab service as "service that operates on irregular routes and schedules on a call-and-demand basis, for compensation for that is usually determined by a meter."  (Ex. 6, Austin Code Subpart N; *see also* Ex. 4, Taxi!, at 54 (Hillsborough County's regulatory definition).)  This description aligns with the 1997 Oxford Dictionary definition of "automobile licensed for hire and usu. fitted with a meter."  (Ex. 7, Oxford Dictionary at 821 (abbreviating "usually" as "usu.").)  In fact, the Patent Office has previously adopted this definition as the plain and ordinary meaning of "taxi."  (Ex. 8, IPR2017-01865, Paper 21 at 8.)

The use of the word "usually" in these definitions is to contrast taxi service from carriers, such as limousines, that provide rides for a prearranged fee.  (Ex. 3, Mundy Decl. at ¶¶ 29-30.)  For example, "non-metered sedans known as Black Car services" are found in New York City.  (Ex. 4, Taxi!, at 63.)  Accordingly, a POSITA in 1998 would understand that a taxi was fitted with a meter in order to determine the fare of a ride – the same meter that is allegedly abused by drivers and is at the heart of the '727 Patent.

\*       \*       \*       \*

Fare does not provide a construction for the term "taxi," stating that it should be given its plain and ordinary meaning.  Adopting such a construction would constitute legal error as a jury may not understand "taxi" consistently with the understanding of a POSITA in 1998.  *Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*, 815 F.3d 1314, 1319 (Fed. Cir. 2016) (the district court erred by finding that claim terms are entitled to their "plain and ordinary meaning" and not resolving the parties' dispute over the scope of a claim term); *NobelBiz, Inc. v. Global Connect, L.L.C.*, 701 Fed. App'x. 995, 998 (Fed. Cir. 2017) (district erred by failing to construe the claim beyond its "plain and ordinary meaning.").

Thus, for all the reasons described above, the Court should adopt the plain and ordinary meaning of the term taxi to a POSITA: "an automobile licensed for hire as a taxi or taxicab and fitted with a meter."

**B.    "Trip Meter"**

| Claim(s) | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| Claim 1 | Plain and ordinary meaning. | "a device in the taxi that determines distance traveled using input collected from the taxi" |

Claim 1 of the '727 Patent recites the limitation "a ***trip meter*** connected to said computer, said ***trip meter*** for measuring an actual trip distance traveled by said taxi between a starting point and a destination point."  This is another claim term where the plain and ordinary meaning to a POSITA was well known, but without an express construction, could be confusing to the jury.

A POSITA in 1998 understood that a taxi trip meter determines the distance traveled using input from the taxi itself.  (Ex. 3, Mundy Decl. at ¶ 39.)  Initially, the meter measured distance traveled by attaching a cable to the non-driving wheel and counting the revolutions. (Ex. 5, Is the Fare Fair, at 3.)  Thereafter, the "meter [was] attached to the taxi's transmission

instead of the wheel." (*Id.*) "To get the distance traveled, the meter relies on a sensor attached to the cab's transmission.  The sensor sends an electric pulse to the meter every time the cab travels a given distance." (Ex. 9, How Taxi Meters Work, at 3; *see also*, Ex. 10, Oka, 1:12-16; Ex. 11, Ricard, 6:55-61.)  Other meter designs received inputs from the taxi's odometer.  (Ex. 12, Murphy, 4:45-48; Ex. 10, Oka, 2:62-68.)

This understanding is consistent with the plain claim language and the specification of the '727 Patent.  Claim 1 specifies that the "trip meter" measures distance traveled.  And, the '727 Patent explains that a "trip meter" measures distance without the use of GPS and map data. In fact, the '727 Patent states that a "trip meter may be eliminated" when "the trip distance [is] determined with GPS and map data." (Ex. 1, '727 Patent, 4:37-39.)  Accordingly, the "trip meter" described in the '727 Patent must determine distance by using information received from the taxi rather than from GPS or map data, consistent with Uber's proposed construction and the understanding of a POSITA.  (Ex. 3, Mundy Decl. at ¶¶ 39-46.)

*     *     *     *

Fare does not provide a construction for the term "trip meter" stating that it should be given its plain and ordinary meaning without explaining a POSITA's understanding of that term. Without a construction, however, Fare is likely to argue, as it does in its infringement contentions, that Uber's App, which relies on GPS, qualifies as a "trip meter."  Accordingly, the Court should provide an express construction of this term to be consistent with the plain and ordinary meaning of the term to a POSITA in 1998.  *AFG Indus., Inc. v. Cardinal IG Co.*, 239 F.3d 1239, 1247 (Fed. Cir. 2001) ("It is critical for trial courts to set forth an express construction of the material claim terms in dispute.")

### C.      "Starting Point" and "Destination Point"

| Term | Claim(s) | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|---|
| Starting Point | Claims 1, 7, 12 | Plain and ordinary meaning. | "geographical location where the ride began" |
| Destination Point | Claims 1, 7, 12 | Plain and ordinary meaning. | "geographical location where the ride ended" |

Uber requests that the Court define the terms "starting point" and "destination point" because those terms have a specific meaning within the context of the asserted claims, which is consistent with their plain and ordinary meaning to a POSITA.  If the plain language is presented to the jury, with no construction, the terms could be misunderstood and misapplied by a jury.  In such circumstances, the Court should construe the terms instead of relying on their plain and ordinary meaning.  *See Abbott Labs. v. Sandoz, Inc*., 544 F.3d 1341, 1360 (Fed. Cir. 2008) ("claims are construed as an aid to the decision-maker" (citing *Multiform Desiccants, Inc. v. Medzam, Ltd.* 133 F.3d 1473, 1477 (Fed. Cir. 1998))); *United Servs. Auto. Ass'n v. MiTek Sys., Inc.,* No. SA-12-CA-282, slip op., at 5 (W.D. Tex. April 2, 2014) (ordering construction of terms because "the [Magistrate's] Markman opinion offers no basis to support a finding that they would be readily understood by an average fact finder.")  Here, there is a significant risk that a jury may ascribe a meaning to these terms that is unsupported by the asserted claims of the '727 Patent.

### 1.      Without Construction, Jury Confusion Is Likely

As used in Claims 1, 7 and 12 of the '727 Patent, the "starting point" and "destination point" refer to the geographic location where a ride begins and ends – in other words, where the taximeter starts and stops tracking the ride to determine the fare.  These terms do not mean, as a jury could misunderstand, the location where a rider requests to be picked up or dropped off.

While the location where a taximeter starts and stops could be the same as a rider's requested pick up and drop off location, they are different in application.

For example, in 1998, a rider could arrange for a limo to pick them up at the airport and drive them to their office for a flat fee.  When that ride occurs, however, the rider could be picked up at departures, arrivals, the airport garage or someplace else at the airport.  And, the rider could be dropped off at their office, or even a few blocks away because traffic is so bad or they decided to grab a sandwich before heading to the office.  Regardless of where the pickup and drop-off occurred, the limo would charge the same rate.  A taxi, however, charges based on distance and time traveled, so each of those pick-up/drop-off permutations have a different cost.  Thus, for the purpose of this '727 Patent, which is a system for estimating the cost of a taxi ride, it is important to know the geographic location of where taxi ride began and ended, and *not* a rider's requested locations.

### 2.    The Plain Language of Claims 1, 7 and 12 Support Uber's Constructions

The plain language of Claims 1, 7 and 12 require that the "starting point" and "destination point" mean the geographic location.  Claim 1 recites: "a trip meter connected to said computer, said trip meter for measuring an *actual* trip distance traveled by said taxi between a starting point and a destination point."  (emphasis added.)  Likewise, Claim 7 recites: "determining an *actual* trip distance traveled by a vehicle after said trip is completed." (emphasis added.)  The only way to measure actual distance is based on the geographic location of the vehicle; any other measure would be an estimate.

Claim 12 is even clearer that the starting point and destination points are the geographic locations where a ride began and ended.  While Claim 12 is directed to "[a]n automated taxi fare estimating method" and refers to various estimations elsewhere in the claim, but the starting

point and destination point themselves are not estimates.  The starting point is determined "based on the received geographical location information" from "at least one location sensor." (emphasis added.)  According to the specification, the location sensor "may be any type of device that indicates the precise geographical location of the vehicle." (Ex. 1, '727 at 2:30-32.)  As discussed below, the embodiments disclosed in the specification also confirm this understanding of Claim 12.

### 3.    The Specification Supports Uber's Construction

Uber's proposed construction that the starting point and destination point are the geographic location where the ride began and ended is further supported by the embodiments in the specification, as represented in Figs. 2 and 3:



Fig. 2

Fig. 3

As shown in the red boxes, in the embodiments represented by these figures, a trip begins and then the starting point is determined, and a trip ends and then the destination point is determined.  This is explained in the specification, for example: "[w]hen a trip is begun at block 21, e.g., when the taximeter is activated or a specific initiating input is provided to the computer, the geographical starting point is determined at block 22, and the starting time is marked at block 23."  (*Id*. at 2:39-43.)

Confirming adherence to these embodiments, Claim 12 recites "determining" the starting and destination points, which is consistent with the embodiments shown in Figs. 2 and 3 above where boxes 22, 26, 42, and 46 state "Determine [Starting/Destination] Point."  By comparison, when the starting and destination points are not based on geographic information, the specification uses "inputted" to describe those points: "the starting and ending points may be inputted before the trip to provide advance notice of the fare."  (*Id*. at 4:33-35.)  *Impulse Tech. Ltd. v. Microsoft Corp.*, 665 F. App'x. 872, 878 (Fed. Cir. 2016) (where the specification uses different terms to represent different concepts, those terms should be construed to be limited to respective concepts.)

In sum, the embodiments claimed in the asserted claims include determining the starting point and destination point based on when the taximeter starts and stops, not based on any predetermined input, which is consistent with Uber's proposed constructions.

### 4.      Dr. Mundy's Declaration Supports Uber's Construction

Finally, Dr. Mundy concurs with Uber's proposed constructions.  (Ex. 3, Mundy Decl. at ¶¶ 47-62.)  In his experience, the starting point and destination point of a taxi ride is when a taxi starts and stops the taximeter, which corresponds to the geographic location where the ride begins and where it ends.  (*Id*. at ¶¶ 53-54, 61-62.)  Thus, for all these reasons, Uber's proposed construction is correct.

### D.      "Waiting Time Encountered in Traffic"

| Claim(s) | Plaintiff's Proposed Construction | Defendant's Proposed Construction |
|---|---|---|
| Claim 12 | Plain and ordinary meaning. | Indefinite.<br>Alternatively, if the Court determines that the term can be construed: "amount of time spent stopped or below a predefined speed threshold" |

Uber requests that the Court find the term "waiting time encountered in traffic" indefinite under 35 U.S.C. § 112 because it is susceptible to multiple reasonable constructions.  In the alternative, Uber asserts that this term should be construed consistent with the plain and ordinary meaning of "waiting time" to a POSITA – namely, "amount of time spent stopped or below a predefined threshold."

### 1.      This Term Is Indefinite

Where terms are susceptible to multiple reasonable understandings, they are indefinite under 35 U.S.C. § 112.  *See Interval Licensing*, 766 F.3d at 1371 (a term is indefinite "if the claim language might mean several different things and no informed and confident choice is available among the contending definitions") (internal quotations omitted) (citing *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2130 (2014)); *see also Light Transformation Techs. LLC v. Lighting Sci. Grp. Corp.,* No. 2:12-cv-826-MHS-RSP, 2014 WL 3402125, at *8-9 (E.D. Tex. July 11, 2014) (finding the claims indefinite because a term was subject to multiple plausible constructions).

Here, the term "waiting time encountered in traffic" is indefinite because it has many potential meanings, including the following three examples:

- The difference between an optimal trip time and the current trip time ("Meaning 1"). For example, if a trip typically takes 15 minutes but takes 25 minutes during rush hour, then the waiting time encountered in traffic would be 10 minutes.

- The amount of time when a taxi is "in traffic" ("Meaning 2").  This time reflects the portion of a trip attributable to "traffic lights, traffic congestion, etc." (Ex. 1, '727 Patent at 3:54.)  Meaning 2, however, leaves open the question what time qualifies as spent "in traffic."

- Uber's alternative construction, which is consistent with the meaning of "wait time" in the taxi industry in 1998: "amount of time spent stopped or below a predefined speed threshold" (Meaning 3).  As explained in Part D.2, below, Uber's alternative construction is consistent with the practice of most taxis to charge a fare based on (1) the distance traveled and/or (2) a "wait time" when the vehicle was below a speed threshold.

In addition to these three meanings, Fare asserts a fourth potential interpretation of "waiting time encountered in traffic," which is the undefined "plain and ordinary meaning." That construction, however, fails to resolve (1) what subset of time within a trip time qualifies as "waiting time encountered in traffic" and (2) what qualifies as "traffic."  For example, does time spent in "usual" or even "light" traffic qualify as "waiting time encountered in traffic," or does the traffic have to be "heavy" to qualify, and what are the thresholds for those measurements?[2]

---

[2]  For this reason, the Court can also conclude that this term is indefinite because it includes a term of degree—"traffic"—without providing any standard for measuring what constitutes traffic. *In Interval Licensing*, the Federal Circuit explained that a term of degree is not indefinite only if the claim language and specification provide "some standard for measuring the scope of the phrase."  766 F.3d at 1370–71.  Where the intrinsic record fails to do that, the term of degree is indefinite. *Id.*  The same is true here.  The '727 Patent does not provide any

The differences in the potential meanings for this term have a material impact on the claim scope and require resolution under *O2 Micro*., 521 F.3d at 1361.  Meaning 1 would capture the full-time difference between the optimal trip and an actual trip, while Meaning 2 would capture some subset thereof that is tied to "traffic" (however that is defined) and could also require detection of traffic impediments.  And, Meaning 3 is limited to the time spent below a predefined speed threshold and would not capture, for example, time spent on a highway in traffic traveling above the threshold, but still well below the speed limit.

The plain language of the claim does not distinguish between these meanings.  Claim 12 recites "determining an estimated ***waiting time encountered in traffic*** during said trip based on the geographical location information and the street information."  (emphasis added.)  The street and geographic information can be used to:  determine the optimal travel time and any deviation therefrom (Meaning 1); identify stoplights or other traffic impediments (Meaning 2); and estimate the amount of time that the vehicle spent below a speed threshold (Meaning 3).

The specification of the '727 Patent also does not distinguish between these potential meanings.  For example, the '727 Patent provides: "[a]n estimated waiting time in traffic along the optimal route is determined at block 51 based on location traffic information and the time of day to account for traffic lights, traffic congestion, etc.  An estimated fare is determined at block 52 based on the estimated shortest trip distance and estimated waiting time, and displayed at block 53."  (Ex. 1, '727 Patent, 3:51-57.)  This disclosure is consistent with all three potential meanings as it references time of day and traffic along optimal route (Meaning 1); traffic lights and traffic congestion (Meaning 2); and calculating an estimated fare based on the waiting time

standard or guidance for measuring how many road impediments are required to constitute "traffic" under Claim 12.

(Meaning 3).  The remaining references to wait time in the specification are all directed to using wait time to calculate the taxi fare and do not impact this construction.  (*Id*. at Fig. 3, blocks 51, 52; 1:24-25; 1:46-48; 4:24-26.)

The term "waiting time encountered in traffic" is also ambiguous to a POSITA.  As Dr. Mundy's declaration explains, there was a clear understanding of "waiting time" in the taxi industry in 1998, but not "waiting time encountered in traffic."  (Ex. 3, Mundy Decl. at ¶¶ 67-68.)  That's because to a POSITA, "waiting time" is the amount of time that a taxi is below a predefined speed threshold that was typically set by some sort of regulatory agency.  (*Id*. at ¶¶ 64-67.)  That time could be because of traffic (*e.g.*, congestion or an accident) or it could be because of some other reason (*e.g.,* the rider stopped by a convenience store to buy milk).

### 2.      If this Term Is Construed, the Court Should Adopt Uber's Proposed Construction.

If this term is construed, Uber's proposed construction, "amount of time spent stopped or below a predefined speed threshold," is the proper construction as it is consistent with the intrinsic and extrinsic evidence.  Although a POSITA would not recognize the term "waiting time encountered in traffic," the patent recites a similar phrase, "waiting time in traffic," when describing prior art taxi fares. (Ex. 1, '727 Patent, 1:24-26.)  Thus, the intrinsic record suggests that this term can be construed consistent with the plain and ordinary meaning of "waiting time" for taxi fare calculation, which is Uber's proposed construction.

Dr. Mundy's declaration and other extrinsic evidence confirm that Uber's proposed construction is aligned with the plain and ordinary meaning of "waiting time" for taxi fare calculations.  (Ex. 3, Mundy's Decl., ¶¶ 64-67.)  For example, The New York City Taxicab Fact Book lists New York City taxi fares between 1952-2006, including fare calculation based on

16

initial charge, mileage charge, and wait time, as shown below.  (Ex. 13, Schaller Consulting, March 2006, at 18, Table 2.)

**Table 2. Taxi fares since 1952.**

|  | Initial Charge | Mileage Charge | Wait Time | Charge per | | Avg. fare |
|---|---|---|---|---|---|---|
|  |  |  |  | Mile | Min-ute |  |
| Before 1952 | $0.20 first 1/4 mi. | $0.05 per 1/4 mi. | $0.05 per 2 min. | $0.20 | $0.03 | $0.83 |
| July 1952 | $0.25 first 1/5 mi. | $0.05 per 1/5 mi. | $0.05 per 90 sec. | $0.25 | $0.03 | $1.06 |
| Dec. 1964 | $0.35 first 1/5 mi. | $0.05 per 1/5 mi. | $0.05 per 90 sec. | $0.25 | $0.03 | $1.16 |
| Jan. 1968 | $0.45 first 1/6 mi. | $0.10 per 1/3 mi. | $0.10 per 2 min. | $0.30 | $0.05 | $1.48 |
| March 1971 | $0.60 first 1/5 mi. | $0.10 per 1/5 mi. | $0.10 per 72 sec. | $0.50 | $0.08 | $2.30 |
| Nov. 1974 | $0.65 first 1/6 mi. | $0.10 per 1/6 mi. | $0.10 per 60 sec. | $0.60 | $0.10 | $2.71 |
| March 1977 | $0.75 first 1/7 mi. | $0.10 per 1/7 mi. | $0.10 per 60 sec. | $0.70 | $0.10 | $3.09 |
| July 1979 | $0.90 first 1/7 mi. | $0.10 per 1/7 mi. | $0.10 per 60 sec. | $0.70 | $0.10 | $3.24 |
| April 1980 | $1.00 first 1/9 mi. | $0.10 per 1/9 mi. | $0.10 per 45 sec. | $0.90 | $0.13 | $4.06 |
| July 1984 | $1.10 first 1/9 mi. | $0.10 per 1/9 mi. | $0.10 per 45 sec. | $0.90 | $0.13 | $4.16 |
| May 1987 | $1.15 first 1/8 mi. | $0.15 per 1/8 mi. | $0.15 per 60 sec. | $1.20 | $0.15 | $5.08 |
| Jan. 1990 | $1.50 first 1/5 mi. | $0.25 per 1/5 mi. | $0.25 per 75 sec. | $1.25 | $0.20 | $5.70 |
| March 1996 | $2.00 first 1/5 mi. | $0.30 per 1/5 mi. | $0.30 per 90 sec. | $1.50 | $0.20 | $6.85 |
| May 2004 | $2.50 first 1/5 mi. | $0.40 per 1/5 mi. | $0.40 per 120 sec. | $2.00 | $0.20 | $8.65 |
| Nov. 2006 | $2.50 first 1/5 mi. | $0.40 per 1/5 mi. | $0.40 per 60 sec. | $2.00 | $0.40 | $9.61 |

Surcharges and flat fares:

- A night surcharge, applying to trips beginning between 8 p.m. and 6 a.m., was added in May 1981.  The surcharge was rescinded in January 1982 for all but the 2,300 fleet cabs.  The 50-cent night surcharge was extended to the entire industry in May 1987.
- $1 surcharge for trips beginning between 4 p.m. and 8 p.m. was added in May 2004.
- A $30 flat fare from JFK airport to Manhattan was adopted in January 1996 and increased to $35 in 2001 and $45 in 2004.  The flat fare was extended to trips from Manhattan to JFK airport in 2006.
- Surcharge for trips to Newark Airport was increased from $10 to $15 in 2004.

Average fare based on 2.8 mile trip with 4.77 minutes of wait time.

Other extrinsic evidence is consistent with this understanding. (Ex. 14, DeseretNews, "Cabs Charge Not Only For Mileage But For The Time Spent At Red Lights," May 27, 1990, at 1-2 ("Once the cab is stopped, riders are charged by the second and not by the mile." … "Any speed under 9.6 mph starts the waiting time rate.");  Ex. 15, EP 0 032 607 ("Baumann"), 6:11-16, ("The meter unit will permit fare rate structure adjustments using wire jumpers that determine the cents/minute, cents/mile, and threshold velocity (i.e. the point at which the instantaneous time fare rate is the same as the distance fare rate.");  Ex. 16, Washington Post,

April 19, 2012 (https://www.washingtonpost.com/wp-srv/special/business/taxi-fares-compared/)
("…a charge for wait time, an additional cost the meter calculates when a cab is sitting idle or
moving at slow speeds… .").)

*     *     *     *

In sum, because Claim 12 specifies that the "waiting time" is "encountered in traffic,"
ambiguity is injected into this term rendering it indefinite.  If the Court, however, determines that
the term can be construed, then for the reasons above, it should be construed consistent with the
plain and ordinary meaning of the term "waiting time," which is "amount of time spent stopped
or below a predefined speed threshold."

Dated:    October 6, 2022

By: */s/ Melissa R. Smith*

Melissa R. Smith
Texas State Bar No. 24001351
**GILLIAM & SMITH, LLP**
303 South Washington Avenue
Marshall, Texas 75670
Telephone: 903.934.8450
Facsimile: 903.934.9257
Email:  melissa@gilliamsmithlaw.com

Benjamin J. Bradford (*pro hac vice*)
Lisa M. Schoedel (*pro hac vice*)
Yusuf Esat (*pro hac vice*)
**JENNER & BLOCK LLP**
353 North Clark Street
Chicago, IL 60654
Telephone: 312-840-7224
Facsimile: 312-840-7324
BBradford@jenner.com
LSchoedel@jenner.com
YEsat@jenner.com

***Attorneys for Defendant Uber Technologies, Inc.***

18

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 6, 2022, the foregoing was served upon counsel of record via electronic mail:

*/s/ Melissa R. Smith*
Melissa R. Smith